IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32154-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ISAIAH NEWTON, JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

BROWN, J.—Isaiah William Newton Jr. appeals his convictions for first degree burglary and resisting arrest. But his briefing does not mention his resisting arrest conviction, except one sentence suggesting cumulative error based on prosecutorial misconduct infected the entire trial. At the outset, we disagree with his suggestion and affirm his resisting arrest conviction. However, he persuasively contends insufficient evidence supports the burglary element of intent to commit a crime, an error underscoring his interrelated concerns over the trial court's decision to give the pattern inference of intent jury instruction. Because his evidence sufficiency challenge is dispositive, we do not reach his other error claims or pro se statement of additional grounds for review. Therefore, we reverse his burglary conviction and remand to dismiss that charge.

FACTS

The State charged Mr. Newton with first degree burglary and resisting arrest. Generally, while in a hallucinogenic state and believing God had instructed him his mother could walk, Mr. Newton, with later disputed permission, climbed through a bedroom window of his disabled mother, Volinda Williams. Ms. Williams fell when he tried to get her to walk. Mr. Newton resisted Tacoma police who responded to the scene. Both Ms. Williams, who rents her bedroom from Kathie Cooper, and Ms. Cooper gave exculpating trial testimony that contradicted their initial reports to police. Mr. Newton visited Ms. Williams in her bedroom up to four times a day, helping her in and out of her bed and wheelchair, assisting her in getting dressed, and bringing her food. Ms. Williams cannot walk unassisted and has been confined to a wheelchair about 20 years.

Specifically, beginning at 12:51 a.m. on May 18, 2012, Mr. Newton called Ms. Williams three times. In the first and second phone calls, he said he wanted to visit her and she told him not to come over until morning. In the third phone call, "[h]e was talking crazy," saying he wanted to share with her that he spoke with God, who told him she could walk. Report of Proceedings (RP) at 62. He told her he was under the influence of a controlled substance that the State later argued was the hallucinogen phencyclidine, commonly known as PCP. She again told him not to come over until morning. Soon, Mr. Newton began pounding on the front door and ringing the doorbell to Ms. Cooper's duplex unit while yelling "mama!" RP at 63. He then went to Ms. Williams' bedroom window, which was closed but not completely secure. He said in a

2

"drunken" voice that "[h]e wanted [her] to open the window because . . . God and he had been talking and . . . [she] could walk again." RP at 64. She noticed his face was "[n]ot normal, . . . not right." RP at 103. She initially refused to open the window for him.

Ms. Williams' and Ms. Cooper's testimony diverged from the police reports. Ms. Williams related no one refused her son entry at the front door. Likewise, Ms. Cooper related she did not do so. Police contradicted these assertions, testifying she told them otherwise upon interview. More importantly, Ms. Williams said she refused to open the window for her son solely because she was in bed and could not reach it. The State asked Ms. Williams on direct examination, "So did [Mr. Newton] open the window?" RP at 66. She answered, "I let him know to open the window if he wanted to come in because I couldn't get out of bed to do that." RP at 66. She later reiterated how she told him "he could come in through my bedroom window . . . [i]f he could open it," RP at 84, "he could open the window [and] . . . come in my room." RP at 99. On cross-examination, she elaborated, "I had more or less invited him in to stop him from being out there, and being loud and bothering people, waking people. It was early in the morning." RP at 100. Thus, she claimed she consented to appease him. Ms. Williams claimed she initially told this to police, but their testimony contradicted her assertion.

According to Ms. Williams, once inside the window, Mr. Newton told her she could walk. She asked him to help her to the restroom by following normal procedures. But "[h]e was convinced that [she] could walk." RP at 69. Insistent and all the while repeating God said she could walk, Mr. Newton placed his arms around Ms. Williams and tried lifting her to her feet so she could walk. After a few attempts, they both fell to

3

the ground. The incident accidentally tore her nightgown, shattered her drinking glass, and knocked over her television and some trinkets. Ms. Williams yelled for help. Mr. Newton repeatedly tried lifting her but was unsuccessful because she is a self-described "big woman" or "big lady." RP at 72, 88, 104. Agitated and wanting to get his attention, she claims she hit and kicked him while telling him to stop and get help. He did not listen. Eventually, Mr. Newton helped Ms. Williams to a feeble standing position, clinging to the doorframe. Afraid of falling again, Ms. Williams asked her son to help her maneuver into her wheelchair. He did not comply with her request, instead standing still and insisting, "Mama, you can walk. God told me you can walk." RP at 76.

Ms. Cooper responded to the screaming and saw Ms. Williams clinging to the wall. She returned to her bedroom and called 911 emergency response, staying there during the entire phone call because she was afraid of Mr. Newton's unstable behavior. Neighbor David Price saw Mr. Newton run to the front door and bang and kick it while hollering for Ms. Williams to open it. Mr. Price soon heard a crash and Ms. Williams screaming to Mr. Newton, "Stop, let me go." RP at 393. At the window, Mr. Price saw Mr. Newton "wrestling" with Ms. Williams, "trying to make her stand on her feet." RP at 395. Because of her disability, his efforts had the result of "picking her up and dropping her, picking her up and dropping her." RP at 395. While doing so, Mr. Newton was telling Ms. Williams to walk, yelling loudly, "By the blood of Jesus you can walk, mama." RP at 395. Mr. Price testified, "he was having some kind of episode, or he wasn't really with it." RP at 396. All the while, Ms. Williams was screaming to Mr. Newton, "Let me go," "Stop. Stop. You're hurting me. You're hurting me." RP at 396, 403. But he kept

4

insisting God had told him she could walk. Neighbor Frank Givens joined Mr. Price at the scene. He saw and heard much the same as Mr. Price, and dialed 911.

Police arrived and twice ordered Mr. Newton to release Ms. Williams but, given his mental state, he did not comply. Officer Robert Hannity deployed an electroshock weapon against him and, after a struggle, soon handcuffed him with the help of officers Travis Waddell and Eric Chell. Throughout this encounter Mr. Newton was screaming, "Mom, mom, you don't need you [sic] wheelchair. You don't need your chair. You don't need it anymore. You don't need your wheelchair, mom." RP at 291.

Ms. Williams was crying and nearly hysterical but was not injured. Officer Hannity reported Mr. Newton "opened that window and unlawfully entered her apartment by climbing in the window." RP at 308. But Officer Hannity admitted he supplied the word "unlawfully." While Officer Hannity reported Mr. Newton had snatched Ms. Williams out of her wheelchair by her neck, he found no sign of strangling.

Mr. Newton did not testify at trial. At the close of the State's evidence, he moved to dismiss the first degree burglary charge for insufficient evidence. He focused his challenge on the element of intent to commit a crime without contesting the element of entering or remaining unlawfully in a building. Mr. Newton explained neither his belligerence nor the eventual assaultive touching and property damage proves he had formed the required intent to commit a crime at the time he opened and climbed through the window, or when he remained in Ms. Williams' bedroom. The trial court denied his motion without explanation. Then, over his repeated objection, the court gave the pattern inference of intent jury instruction, declaring,

5

A person who enters or remains unlawfully in a building may be
inferred to have acted with intent to commit a crime against a person or
property therein. This inference is not binding upon you and it is for you to
determine what weight, if any, such inference is to be given.

Clerk's Papers (CP) at 29; *accord* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN

JURY INSTRUCTIONS: CRIMINAL (WPIC) 60.05, at 15 (3d ed. 2008); *see also* RCW

9A.52.040.[1] Again, Mr. Newton explained the State did not show his alleged intent to

commit a crime flowed more likely than not from entering or remaining unlawfully in Ms.

Williams' bedroom. The court reasoned the inference's permissive nature eliminated

his concerns, apparently feeling unbound by *State v. Sandoval*, 123 Wn. App. 1, 94

P.3d 323 (1994), and the judicial opinions it cites.

In closing and rebuttal arguments, the State argued it had proved the element of

intent to commit a crime by showing Mr. Newton intentionally assaulted Ms. Williams

and caused property damage. Further, the State extensively argued witness credibility

without objection. Over pages of the record, the State thematically argued about lies,

lying, and liars in a manner we think was improper, but which does not affect the

dispositive evidence insufficiency.[2]

---

[1] Additionally, the trial court gave the pattern voluntary intoxication jury instruction, declaring, "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant acted intentionally or knowingly." CP at 30; *accord* 11 WPIC 18.10, at 282; *see also* RCW 9A.16.090.

[2] Our decision to reverse Mr. Newton's burglary conviction and dismiss the burglary charge would limit our prosecutorial misconduct and cumulative error analyses to his resisting arrest conviction. But any errors, considered individually or cumulatively, are not substantially likely to affect the jury's verdict on the resisting arrest charge because they concern his burglary conviction solely and ample evidence supports his resisting arrest conviction. Therefore, we would conclude he received a fair trial.

6

The jury found Mr. Newton guilty as charged. He appealed.

ANALYSIS

The dispositive issue is whether sufficient evidence supports Mr. Newton's first degree burglary conviction. He contends the State failed to prove he entered or remained unlawfully in Ms. Williams' bedroom with intent to commit a crime.

The State must prove all essential elements of a charged crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). And, double jeopardy principles prohibit the State from trying a criminal defendant a second time if it failed to muster sufficient evidence the first time. *Burks v. United States*, 437 U.S. 1, 11, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).

Evidence is sufficient to support a guilty finding if "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). An evidence sufficiency challenge "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the jury's assessment of conflicting testimony, witness credibility, and evidence weight. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

The essential elements of first degree burglary include "enter[ing] or remain[ing] unlawfully in a building" "with intent to commit a crime against a person or property

7

therein." RCW 9A.52.020(1)(b). A person enters or remains unlawfully in a building "when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(5). A person acts with intent to commit a crime "when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). Generally, inferences are disfavored in criminal law. *State v. Cantu*, 156 Wn.2d 819, 826, 132 P.3d 725 (2006). A jury may, however, infer the defendant's specific criminal intent from his or her conduct if it is not "'patently equivocal'" and instead "'plainly indicates such intent as a matter of logical probability.'" *State v. Bergeron*, 105 Wn.2d 1, 20, 711 P.2d 1000 (1985) (quoting *State v. Bergeron*, 38 Wn. App. 416, 419, 685 P.2d 648 (1984), *aff'd*, 105 Wn.2d 1)); *see State v. Lewis*, 69 Wn.2d 120, 124, 417 P.2d 618 (1966).

Mr. Newton argues the State did not prove the element of intent to commit a crime. We agree. While a rational jury could, viewing the evidence in the light most favorable to the State, find he entered or remained unlawfully in Ms. Williams' bedroom beyond a reasonable doubt, no evidence shows his intent was anything other than to show her she could walk. Neither his belligerence nor the eventual assaultive touching and property damage proves he had formed the required intent to commit a crime at the time he opened and climbed through the window, or when he remained in her bedroom. No evidence shows he entered or remained unlawfully in her bedroom with the objective or purpose to accomplish a result constituting a crime. The jury could not infer his specific criminal intent from his conduct because it does not plainly indicate such intent as a matter of logical probability. A rational jury could not, viewing the evidence in the

8

light most favorable to the State, find the element of intent to commit a crime beyond a reasonable doubt. *Cf. State v. Woods*, 63 Wn. App. 588, 591-92, 821 P.2d 1235 (1991). Thus, we conclude insufficient evidence supports Mr. Newton's first degree burglary conviction. Accordingly, we reverse his burglary conviction and remand to dismiss that charge.

Considering our holding, we acknowledge Mr. Newton's interrelated concern regarding the permissive inference instruction to stress the due process risks of giving it. In a burglary prosecution, this instruction allows the jury to infer the defendant's alleged intent to commit a crime from his or her act of entering or remaining unlawfully in a building. *See* WPIC 60.05, at 15; *see also* RCW 9A.52.040. The trial court may, with caution, give this instruction if the State shows the defendant's alleged intent flows more likely than not from his or her act, and the inference is not the sole evidence of intent. *State v. Brunson*, 128 Wn.2d 98, 107-12, 905 P.2d 346 (1995); WPIC 60.05 note on use & cmt. at 15; *see State v. Drum*, 168 Wn.2d 23, 36, 225 P.3d 237 (2010); *State v. Deal*, 128 Wn.2d 693, 700, 911 P.2d 996 (1996); *State v. Jackson*, 112 Wn.2d 867, 875, 774 P.2d 1211 (1989); *see also County Court v. Allen*, 442 U.S. 140, 165-67, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979). Where, as here, the inference is the sole evidence of intent, the State must show the defendant's alleged intent flows beyond a reasonable doubt from his or her act. *Brunson*, 128 Wn.2d at 107, 109, 110-11; WPIC 60.05 note on use & cmt. at 15; *see Drum*, 168 Wn.2d at 35-36; *Deal*, 128 Wn.2d at 700 & n.4; *Jackson*, 112 Wn.2d at 875; *see also Allen*, 442 U.S. at 166-67.

9

In *Sandoval*, 123 Wn. App. 1, the trial court erred by giving the inference of intent instruction. While intoxicated by alcohol, the defendant kicked open the door of a stranger's residence, apparently mistaking it for his own. *Id.* at 3, 5. The occupant confronted the defendant inside. *Id.* Surprised, the defendant shoved the occupant. *Id.* The *Sandoval* court concluded "there is no fact, alone or in conjunction with others, from which [the defendant's alleged] intent to commit a crime more likely than not could flow." *Id.* at 5. The State did not show his alleged intent to commit a crime flowed more likely than not from his act of entering or remaining unlawfully in a stranger's residence. *Id.*

Mr. Newton's case is somewhat similar to *Sandoval*. While under the influence of PCP, he opened and climbed through the window to Ms. Williams' bedroom without guise. He tried to get her to walk because he believed God had answered his prayers and enabled her to do so. "He was convinced that [she] could walk." RP at 69. He committed the assaultive touching solely in his surprised attempt to show her she could walk. He did not express animus towards her. He did not try to sneak in or flee from her bedroom, was not wearing clothes or carrying tools associated with burglary crimes, and made no effort to take or consciously destroy property. No fact exists, alone or in conjunction with others, from which his alleged intent to commit a crime could flow beyond a reasonable doubt. The State did not show his alleged intent to commit a crime flowed beyond a reasonable doubt from his act of entering or remaining unlawfully in her bedroom. The trial court erred by giving the inference of intent instruction.

Because Mr. Newton's evidence sufficiency challenge is dispositive, we do not address his remaining contentions.

10

No. 32154-1-III
*State v. Newton*

Affirmed in part.  Reversed and remanded in part.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Brown, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

11